UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ACME AMERICAN REPAIRS, INC.,
ACME AMERICAN ENVIRONMENTAL CO, INC.,
ACME COMMERCIAL KITCHEN DESIGN, INC.,
ACME AMERICAN REFRIGERATION, INC.,
ACME PACIFIC REPAIRS, INC., BANA PARTS, INC.,
and BANA PARTS COMMERCIAL KITCHEN, INC.,

                              Plaintiffs,                  MEMORANDUM
                                                                 AND OPINION
        -against-                                      CV-03-4740 (BMC)(SMG)

HARVEY KATZENBERG and
PEARL KATZENBERG, f/k/a PEARL FEUER,

                              Defendants.
-----------------------------------------------------------------------X
GOLD, S., U.S.M.J.:

## Introduction

      This Memorandum addresses defendants' motion to disqualify plaintiffs' counsel. Plaintiffs recently discharged the attorney who had been representing them in this action and retained new counsel, the Law Offices of Vincent McNamara ("McNamara"), in his stead. Defendants' motion is based on McNamara's defense of Donna Zerbo ("Zerbo") in a pending state court malpractice action brought by defendant Harvey Katzenberg. Zerbo, who has long served as plaintiffs' outside counsel, also once represented Katzenberg[1] individually in connection with a stock sale. Defendants contend that McNamara, by virtue of his representation of Zerbo in the malpractice action, will have access to confidential communications between Katzenberg and Zerbo that may assist him in the prosecution of this action.

      In the action pending before this court, plaintiffs are several companies that together

---

[1]Where not otherwise indicated, "Katzenberg" refers to defendant Harvey Katzenberg.

comprise the Acme Group ("Acme"). Defendant Harvey Katzenberg was at one time the president and part owner of Acme. Acme obtained its insurance through a broker named G.K. Alan that was owned and operated by Harvey Katzenberg and his wife, Pearl. Plaintiffs contend that the Katzenbergs defrauded them out of more than two million dollars by overcharging Acme for the insurance it purchased on Acme's behalf.

I heard oral argument on defendants' motion on February 13, 2007. I denied the motion and indicated I would issue a written decision setting forth the reasons for my ruling. Minute Entry of 03/15/2007; Transcript of Feb. 13, 2007 Oral Argument ("Tr.") at 36.

## Background

The pertinent facts are undisputed. Acme is in the business of repairing commercial kitchen equipment. H. Katzenberg Decl. ¶ 3. Defendant Katzenberg began working for Acme in or about 1977. *Id.* Over time, Katzenberg rose to the level of chief operating officer and, in 1980, president. H. Katzenberg Decl. ¶ 4; H. Katzenberg Dep. at 9. In 1995, Katzenberg and a partner, Birinder Madan, purchased Acme from its prior owner. H. Katzenberg Decl. ¶ 6; Def. Mem. Supp. Mot. at 3.

The lawsuit pending before this court involves the premiums paid by Acme for its insurance. From 1985 to 2003, Acme obtained its insurance through a brokerage firm called G.K. Alan, which is owned and operated by Harvey Katzenberg and his wife, Pearl. Am. Compl. ¶¶ 27-28. Pearl provided the brokerage services and obtained workers compensation, general commercial liability, and automobile insurance for Acme. It is undisputed that Pearl Katzenberg deliberately provided false information to the insurance companies with which she placed Acme's business in order to obtain reduced premiums on Acme's behalf. Indeed, in a letter

dated June 4, 2003 to Zerbo, Acme's attorney, Pearl Katzenberg wrote:

> You will realize that these payrolls are tremendously understated; hence the large savings afforded each of the companies . . . All the vehicles that are actually based in Brooklyn were rated on all policies in Lindenhurst, Suffolk County that afforded those companies with vehicles another tremendous savings. . . . I can only make an educated guess as to what the real umbrella and auto premiums would have been had the companies been given the proper information.

Decl. of Donald N. MacKenzie in Opp'n Mot. Disqualify Pl.s' Counsel ("MacKenzie Decl."), Ex. F at 1. It is also undisputed that G.K. Alan inflated the premiums actually charged by the defrauded insurance companies when it billed Acme so that it could retain some of the "savings" achieved by the fraud. In the same letter quoted above, Pearl Katzenberg wrote that:

> [t]he original deal was made with Nat [Acme's then owner] in the mid 1980's who agreed that I should receive a percentage of the money that Acme would save. . . . When I explained the risks, Nat told me to take a third for myself. . . . I totally believe that I am entitled to the monies earned by G.K. Alan due to the fact that much larger savings went to the Acme Group and this is all money that should have been paid to the insurance companies.

*Id.* at 1, 4. Harvey Katzenberg also acknowledges the insurance scheme. In a declaration filed in support of the pending disqualification motion, he states as follows:

> 21. Commencing in the middle of the 1980s, the Acme Group regularly provided artificially depressed payroll figures and erroneous employee work category classifications. The result was substantially lower insurance premiums.
>
> 22. The various principals of...Acme...including...Lazzari, were fully aware of and complicit in this plan...in fact, the Acme Group and its principal owners...benefitted greatly from the reductions achieved in insurance premiums as a result of consistent reporting of erroneous data....
>
> 23. In or around the spring of 2003,...the Acme Group began to

> believe that G.K. Alan and my wife and I had overbilled it for insurance services....

H. Katzenberg Decl. ¶¶ 21-23.

Plaintiffs claim in this action that they were unaware of the insurance scheme. They sue to recover the amounts by which they were "overcharged" by G.K. Alan, alleging that defendants violated RICO and asserting claims, among other things, for fraud, breach of contract, breach of fiduciary duty, and conversion.

The malpractice action in which McNamara represents Zerbo – and which underlies defendants' disqualification motion – arises from Katzenberg's sale of his Acme stock. In late 2000, Katzenberg decided to sell his stock to Derval Lazzari ("Lazzari"), who was then an Acme employee. H. Katzenberg Decl. ¶ 10. Katzenberg arranged for Zerbo to serve as his attorney in the transaction. *Id.* ¶ 11. Zerbo had long served as Acme's outside counsel, and Katzenberg presumably developed a close working relationship with her as a result. *Id.*

On January 3, 2001, Katzenberg sent Zerbo a memorandum setting forth the terms of the stock transaction. *Id.* The purchase price for the stock was $6,400,000. *Id.* ¶ 12. Zerbo helped Katzenberg structure the transaction, which included an agreement (the "Consulting Agreement") by Lazzari to pay a consulting fee of $25,000 a month for 15 years, totaling 4.5 million dollars, directly to G.K. Alan. *Id.* ¶¶ 13, 16. According to Katzenberg, the reason for paying part of the consideration in the form of consulting fees was to obtain certain tax advantages. *Id.* ¶ 13. At her deposition, with no objection from counsel for the Katzenbergs interposed at any point, Zerbo described her conversations with Katzenberg about the stock transaction as follows:

> Q: ...What did you say to him [H. Katzenberg] and what did he say to you concerning the structure of the transaction?

> A: I said to him, I guess keying off of this, there are two ways to structure the transaction; sale of stock with a downpayment and promissory note. And then the other structure as he was aware we had done this in [another] case, that is to sell the stock and have a consulting agreement.
>
> Q: And did you explain to him how one transaction different from another?
> ...
>
> A: We both conversed as to the ramifications of that structure. One structure sale of stock would produce a capital gain tax-wise.
> ...
>
> Q: Did you voice any objection to the structure [H. Katzenberg] was proposing, namely, this sale consulting agreement structure?
>
> A: I reminded him of the tax deferentials [sic] and cautioned it as a write off of business expenses.
>
> Q: What was the caution that you provided him with?
>
> A: Not to go crazy in writing off amounts.

Zerbo Dep. at 54-57. According to Zerbo, she and Katzenberg maintained an attorney-client relationship, at least with respect to the stock transaction, from 2001 through the end of 2002. H. Katzenberg Decl. ¶ 18; Zerbo Dep. at 141-42.

Zerbo testified at her deposition that she learned of the insurance fraud that gives rise to this lawsuit in early 2003. Zerbo Dep. at 153. She then told Katzenberg she knew about the fraud and was representing Acme in connection with it. *Id.* at 155. From January through June of 2003, Zerbo had two or three conversations with Katzenberg about the insurance fraud allegations but deliberately avoided discussing other Acme business. *Id*. at 156-57. Zerbo raised the possibility of a settlement of Acme's claims with Katzenberg during this time, and also

advised him that the amounts at issue were large and that he should retain his own counsel if he was not interested in a settlement. *Id.* at 160.

When – according to Zerbo and Lazzari – the Katzenbergs' insurance fraud came to light, Lazzari stopped paying the consulting fees he owed as a result of the stock transaction. G.K. Alan then sued Lazzari to recover the payments due under the Consulting Agreement. H. Katzenberg Decl. ¶ 30. Meanwhile, Katzenberg sued Zerbo for malpractice, claiming in essence that Zerbo should have crafted an agreement that would have better insulated G.K. Alan's right to be paid consulting fees even in the face of allegations of fraud. More specifically, Katzenberg charges Zerbo with malpractice for her:

> (i) failure to demand or negotiate to provide adequate security in the event of a default by Lazzari; (ii) failure to include any provision whereby Lazzari would pledge the stock as security for performance of his obligations under the Consulting Agreement, or even to advise of the importance of a pledge agreement; and (iii) failure to cross-reference the sale agreement, consulting agreement and other documents, thereby making it more difficult for G.K. Alan to establish that the documents and agreements were part of one integrated transaction.

H. Katzenberg Decl. ¶ 32. McNamara, plaintiffs' newly retained counsel in this action, also represents Zerbo in the malpractice case.

The trial court presiding over G.K. Alan's claims against Lazzari has granted Lazzari summary judgment, and an appeal is pending. Tr. at 13-14. The malpractice action has been "dormant" pending final resolution of G.K. Alan's lawsuit. H. Katzenberg Decl. ¶ 35.

Defendants move to disqualify McNamara in this action based on Cannon 9 of the Code of Professional Responsibility. Def. Mem. Supp. Mot. at 15. For reasons set forth below, the motion is denied.

**Discussion**

A motion to disqualify an attorney appearing before this Court is governed by federal law. *Arifi v. De Transp. Du Cocher, Inc.*, 290 F. Supp. 2d 344, 348 (E.D.N.Y. 2003). The applicable ethical rules are those set forth in the New York State Lawyer's Code of Professional Responsibility as interpreted and applied by the United States Supreme Court, the Second Circuit, and this Court. *See* Local Civil Rule 1.5(b)(5).

Federal courts have a responsibility to supervise the lawyers that appear before them and to ensure that unethical conduct does not "taint" a proceeding. *Bottaro v. Hatton Assoc.*, 680 F.2d 895, 896 (2d Cir. 1982); *Bd. of Educ. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975). When exercising this responsibility, however, courts must bear in mind a party's right to choose his or her counsel and the possibility that a disqualification motion has been brought for tactical reasons. *Hempstead Video, Inc. v. Inc. Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005); *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983); *Nyquist*, 590 F.2d at 1246; *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739-40 (2d. Cir 1978). Accordingly, courts should take a "restrained approach" to motions to disqualify and grant them only in limited circumstances. *Bottaro*, 680 F.2d at 896.

The limited circumstances in which disqualification may be warranted include those (1) where conflicts of interest undermine "the vigor" of an attorney's representation and (2) "where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation. . . thus giving his present client an unfair advantage." *Nyquist*, 590 F.2d at 1246. *See also Defazio v. Wallis*, 459 F. Supp. 2d 159, 163 (E.D.N.Y. 2006),

7

*quoting Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) ("This risk of taint is encountered when an attorney [] might benefit a client in a lawsuit by using confidential information about an adverse party obtained through prior representation of that party.") In proving these limited circumstances, the movant must meet "a high standard of proof." *Gov't of India*, 569 F.2d at 739.

Defendants contend that McNamara, by virtue of his representation of Zerbo in the malpractice action, "is at least potentially in a position to use privileged information" concerning Katzenberg, thus giving Acme "an unfair advantage" in this litigation. Defendants' argument implicates Canons 4 and 9 of the Code of Professional Responsibility. Canon 4 provides that "A Lawyer Should Preserve the Confidences and Secrets of a Client," and Disciplinary Rule 4-101 states that "a lawyer shall not knowingly: 1. Reveal the confidence or secret of a client. 2. Use a confidence or secret of a client to the disadvantage of the client. 3. Use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure." N.Y. Code of Prof. Resp. § DR4-101(B) (McKinney 2003). Canon 9, as reiterated in Ethical Consideration 9-6, urges that "[e]very lawyer . . . strive to avoid not only professional impropriety but also the appearance of impropriety." N.Y. Code of Prof. Resp. § EC- 9-6 (McKinney 2003).

When an attorney's former client is now his adversary, and his representation of the former client allowed him access to privileged information, courts have been mainly concerned with (1) the similarity of the issues in the two cases, and (2) the likelihood that the lawyer's role in the prior case gave him access to "*relevant* privileged information." *Gov't of India*, 569 F.2d at 739 (emphasis added). In *Evans*, the Second Circuit articulated a three-pronged inquiry for

8

determining whether an attorney could properly represent a party under these circumstances. The court stated:

> To ensure faithful adherence to [Cannon 4], an attorney *may* be disqualified...if (1) the moving party is a former client of the adverse counsel; (2) there is a substantial relationship between the subject of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

Evans, 715 F.2d at 791 (emphasis added). When the *Evans* test is applied to the facts presented here, it becomes clear that disqualification is not warranted.

*1) Prior Representation*

The first prong of the *Evans* test requires that the party moving for disqualification be a former client of the attorney who is the subject of the motion. *See also, Hempstead*, 409 F.3d at 133; *Defazio*, 459 F. Supp. 2d at 163-64 (citing cases). These are not the precise circumstances presented here, where the prior attorney-client relationship at issue is Zerbo's representation of Katzenberg. Nevertheless, Zerbo's prior representation of Katzenberg may properly be imputed to McNamara by virtue of his role as Zerbo's attorney, which has presumably afforded him access to confidential communications between Zerbo and Katzenberg. Indeed, having been sued for malpractice, Zerbo may properly reveal privileged communications she had with Katzenberg to the extent necessary to defend herself. *See* N.Y. Code of Prof. Resp. § DR 4-101(C)(4) (McKinney 2003) ("A lawyer may reveal. . . [c]onfidences or secrets necessary to. . . defend the lawyer. . . against an accusation of wrongful conduct.").

While this case may be factually distinct from *Evans* and other typical cases, the risk that

confidential communications may be misused is the same. *See Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973) (holding that courts must "prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage"). I therefore conclude that defendants have met the first prong of the *Evans* test.

*2) Substantial Relationship*

The next prong of the test requires that there be a "substantial relationship" between the issues in the pending case and those involved in the prior representation. To warrant disqualification, the issues involved in the two representations must be "identical" or "essentially the same." *Gov't of India*, 569 F.2d at 739-40. *See also U. S. v. Standard Oil, Co.,* 136 F.Supp. 345, 356-57 (S.D.N.Y. 1955). Put differently, a substantial relationship exists when the material facts of the prior representation are "necessary to the present litigation." *United States Football League v. Nat'l Football League*, 605 F.Supp. 1448, 1459 (S.D.N.Y. 1985). There is no such relationship here.

It is undisputed that Zerbo represented Katzenberg in connection with the sale of his Acme stock to Lazzari. The closing of the transaction took place on March 21, 2001, in Zerbo's office, with Katzenberg, Zerbo, Lazzari, and Lazzari's attorney present. H. Katzenberg Decl. ¶ 14. The documents executed at the closing included a Stock Purchase Agreement and the Consulting Agreement. *Id.* Lazzari has since refused to make payments called for in the Consulting Agreement, invoking as justification – successfully, thus far – his contention that the Katzenbergs schemed to defraud insurance companies and overbill Acme. *See* Order of Hon. Zelda Jones dated October 17, 2005, in *G.K. Alan v. Lazzari*, MacKenzie Decl., Ex. A at 4. In

his malpractice suit, Katzenberg alleges in essence that Zerbo should have crafted the Stock Purchase and Consulting Agreements in a manner that would have overcome this defense to payment. H. Katzenberg Decl. ¶ 32; Tr. at 11-12. The malpractice action lies dormant on the theory that, if G.K. Alan prevails in its action against Lazzari for consulting fees, Katzenberg will have suffered no damages as a result of Zerbo's malpractice. H. Katzenberg Decl. ¶ 35; Tr. at 15.

The primary issue raised by the malpractice action is whether Zerbo properly prepared the closing documents for the sale of Katzenberg's stock to Lazzari. It is true that the insurance fraud alleged in the case before this Court is the basis on which Lazzari seeks to defeat his obligations under those closing documents. However, the questions raised by the case before this court are simply not at issue in the malpractice action; the professional competence with which Zerbo prepared the closing documents will undoubtedly be assessed in that case regardless of the specific challenge Lazzari has raised to his obligations under them. The critical question in this case – whether G.K. Alan defrauded and damaged the plaintiffs by overbilling for insurance premiums as a means of sharing in the proceeds of the insurance fraud – is irrelevant to the malpractice action. Thus, because the issues involved in the malpractice action in the case before this Court are not "identical" or "essentially the same," defendants have failed to meet the second prong of the *Evans* test.

*3) Likelihood of Access to Relevant Privileged Information*

The final prong of the *Evans* test asks whether the attorney who is the subject of the motion likely attorney had access to relevant privileged information. This prong does not require a showing that specific privileged information actually was imparted, but only that sharing of

11

relevant privileged information was likely. *Arifi*, 290 F. Supp. 2d at 350; *T.C. Theater Group v. Warner Bros. Pictures*, 113 F.Supp. 265, 268-69 (S.D.N.Y. 1953). Where a substantial relationship exists between the two representations and the attorney had more than a peripheral relationship to the prior representation, a court should presume that the attorney had access to relevant confidential information. *Defazio*, 459 F. Supp. 2d 159, 164-65. For the reasons stated below, the communications at issue in this case are neither relevant nor privileged.

    a. Relevance

As discussed above, there is no substantial relationship between the malpractice action and the case before this Court. Defendants have failed to establish, even generally, that Zerbo and Katzenberg discussed facts relevant to this case in the course of their attorney-client relationship. Moreover, Zerbo's authority to reveal Katzenberg's confidential communications with her to McNamara is limited to those communications necessary to defend the malpractice action. *See* N.Y. Code of Prof. Resp. § DR 4-101(C)(4) (McKinney 2003). Those communications involve the circumstances surrounding the sale of Katzenberg's stock to Lazzari; there is no reason to believe that confidential communications about the insurance fraud – if they occurred – would be relevant to the defense of Katzenberg's malpractice claim. Thus, to the extent Katzenberg's privileged information might be disclosed by Zerbo to McNamara, that information would not be sufficiently relevant to this action to warrant disqualification.

    b. Waiver of Privilege

Moreover, even if the information Zerbo might impart to McNamara pursuant to DR 4-101(C)(4) were relevant, I conclude that it is no longer privileged for several reasons. In short, many of the communications between Zerbo and Katzenberg have been described in deposition

testimony and are likely to become part of the public record during the malpractice action. Moreover, to the extent Zerbo and Katzenberg discussed the insurance fraud during the course of their attorney-client relationship, the crime-fraud exception would most likely undermine any claim that those discussions were privileged.

*Waiver By Assertion*

A waiver "by assertion" occurs when a client puts otherwise privileged communications at issue in some way in a litigation. *GPA Inc. v. Liggett Group, Inc.*, 1996 WL 389288, *3 (S.D.N.Y. July 10, 1996). This type of waiver applies when a client sues a former attorney for malpractice, and even "if the client is challenging the attorney's competence or integrity [and] the attorney is *not* a party to the litigation." *Id.* As noted above, in such cases, Disciplinary Rule 4-101(C)(4) permits an attorney to disclose otherwise privileged communications, albeit only "in the narrow context of the attorney's own defense." *Morin v. Trupin*, 728 F. Supp. 952, 956 (S.D.N.Y. 1989), *quoting Housler v. First Nat'l Bank of East Islip,* 484 F.Supp. 1321, 1323 (E.D.N.Y.1980); *Meyerhofer v. Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1194 -1195 (2d Cir. 1974) ("recognizing 'that a lawyer may reveal confidences or secrets necessary to defend himself against 'an accusation of wrongful conduct'").

By suing Zerbo for malpractice in connection with the sale of his stock, Katzenberg has put his communications with her about that transaction at issue. To the extent that Zerbo needs to reveal confidences to defend herself in that action, she may do so consistent with the rules of professional responsibility as embodied in DR-4-101(C)(4). Moreover, once the privileged communications are disclosed in the malpractice action, they may not be protected in other litigation; where communications are disclosed publicly in one action, they cannot be deemed

privileged for purposes of another. *GPA Inc.*, 1996 WL 389288, at *4, n.2 (stating the "well-settled principle in this and other jurisdictions that a client cannot disclose, or authorize disclosure of, privileged information in a litigative context and still withhold the same information in a subsequent suit or from other parties" and citing cases).

Presumably, the pleadings in the malpractice action will be publicly filed and the case will be tried in open court. Once otherwise privileged communications are revealed in publicly filed documents or open proceedings, they will be available to anyone, and not just to McNamara. Accordingly, having put the competence of Zerbo's representation in issue, Katzenberg may no longer claim that any communications Zerbo discloses to defend herself remain privileged or that McNamara will have any special access to privileged communications by virtue of his role as counsel to Zerbo in the malpractice case.

*Waiver By Voluntary Disclosure*

Although Katzenberg has implicitly waived his attorney-client privilege by asserting a malpractice claim, I hesitate to conclude on that basis alone that no privilege remains whatsoever. There are two reasons for my hesitation. First, it is conceivable that Zerbo might share privileged communications with McNamara in preparation of her defense, but that those communications might not be revealed in the public record of the malpractice case. Second, as noted above, the malpractice case is now dormant and might not proceed until after this litigation is concluded, if it proceeds at all. Under either circumstance, McNamara might have access to privileged communications that would not, at least as a practical matter, be available to any another attorney.

However, there is a second basis for concluding that Katzenberg's privilege claim has

14

been waived. A client who voluntarily discloses a communication, consents to its disclosure by another, or even "voluntarily undertakes actions that will predictably lead to disclosure" to a third party, waives the attorney-client privilege. *GPA Inc.*, 1996 WL 389288, at *2. Moreover, once a client authorizes disclosure of one privileged communication, courts will generally "require[] disclosure of all otherwise privileged communications on the same subject." *Id.* at *3. Particularly when the disclosure takes place in the context of litigation, the privilege is surrendered not only with respect to the communication disclosed but also as to all other communications on the same subject. *See, e.g., Brewer v. Hall,* 2005 WL 2219304, *2 (E.D.N.Y. Sept. 12, 2005), *citing In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459, 468, 472-73 (S.D.N.Y.1996). Broad subject matter waiver applies with particular force when "justified by considerations of fairness to the adversary." *John Doe Co. v. U.S.*, 350 F.3d 299, 302 (2d Cir. 2003). *Cf. In re Von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) (stating "the rule that testimony as to part of a privileged communication, in fairness, requires production of the remainder," but declining to apply the rule where the disclosure of privileged communications is "extrajudicial . . . and those disclosures have not subsequently been placed at issue during litigation").

The record in this case reveals that Katzenberg has both himself disclosed confidential communications he had with Zerbo and allowed Zerbo to testify about those communications without objection. Zerbo has been examined at a deposition intended for use in both this action and the pending state court lawsuit brought by G.K. Alan against Lazzari. MacKenzie Decl., Ex. I. As set forth in detail above, Zerbo provided detailed testimony about her conversations with Katzenberg about the sale of his stock. *Supra* at 4-5. Although Katzenberg was represented by counsel at the deposition, no objection to Zerbo's testimony was raised. Similarly, Katzenberg,

15

in an affidavit submitted to the state court in support of G.K. Alan's motion for summary judgment, recounted the substance of some of his conversations with Zerbo about the structure of the stock sale. MacKenzie Decl., Ex. H ¶¶ 23-25. Katzenberg made similar disclosures in a declaration he submitted to this Court in support of the pending disqualification motion. H. Katzenberg Decl. ¶¶ 11, 13.

In light of Katzenberg's decision not to raise a privilege objection to Zerbo's testimony about her communications with him concerning his sale of Acme stock, and in light of Katzenberg's own sworn statements disclosing some of the same communications, I conclude that Katzenberg has waived the attorney-client privilege with respect to all of his communications with Zerbo about the sale of his stock. Those communications are therefore discoverable by any attorney – not only McNamara – and McNamara's representation of Zerbo in Katzenberg's pending malpractice action accordingly works no unfair advantage against him in this case.

*Crime Fraud Exception*

For the reasons stated above, I conclude that there is not a substantial relationship between Katzenberg's malpractice action against Zerbo and the case before this Court. I further conclude that the communications between Katzenberg and Zerbo concerning the sale of Katzenberg's stock are no longer privileged.

To the extent that Zerbo and Katzenberg had privileged communications about the insurance fraud at issue in this case, those communications would be relevant to this action. It seems unlikely, however, that Zerbo would be authorized by DR 4-101(C)(4) to disclose those communications to McNamara, because they would not be necessary to her malpractice defense.

16

In any event, Katzenberg's communications with Zerbo about the insurance fraud scheme would almost certainly not be privileged. The crime-fraud exception to the attorney-client privilege provides that otherwise privileged communications lose their privileged status if they are made in furtherance of a crime or fraud. *U.S. v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). *See also U.S. v. Zolin*, 491 U.S. 554, 562-563, 109 S. Ct. 2619, 2626 (1989). In such cases, "[a] party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *Jacobs*, 117 F.3d at 87.

Plaintiffs here have not attempted to invoke the crime-fraud exception. However, Katzenberg has himself submitted a declaration in which he acknowledges that: "[the] Acme Group regularly provided artificially depressed payroll figures and erroneous employee work category classifications. The result was substantially lower insurance premiums." H. Katzenberg Decl., ¶ 21. In addition, plaintiffs have submitted a letter written by Pearl Katzenberg, which similarly concedes an ongoing fraudulent scheme. MacKenzie Decl., Ex. F. Finally, the fraud was acknowledged by defense counsel during oral argument. Tr. at 15-16.

Zerbo has testified, apparently without contradiction, that she and Katzenberg maintained an attorney-client relationship, at least with respect to the stock transaction, from 2001 through the end of 2002. Zerbo Dep. at 141-42. Zerbo further testified that, when she learned of the insurance fraud in early 2003, she promptly told Katzenberg she was representing Acme in connection with it. Zerbo Dep. at 153, 155. Thus, any attorney-client communications concerning the insurance fraud – which Zerbo denies ever took place[2] – would have to have

---

[2] *See* Zerbo Decl. in Opp'n Mot. to Disqualify Counsel ¶ 6.

occurred prior to early 2003. The complaint in this action alleges that the Katzenbergs' fraud scheme continued from 1995 through 2002. Am. Compl. ¶¶ 32 *et seq*. Thus, if there were any attorney-client communications between Zerbo and Katzenberg concerning the insurance fraud, they would almost certainly have taken place during the commission of the fraud and been in furtherance of it. Under those circumstances, the crime-fraud exception would strip the communications of any otherwise applicable privilege.[3]

## Conclusion

Defendants have failed to establish the elements necessary for disqualification as set forth in *Evans*. The malpractice action is not "substantially related" to this case. Any communications between Zerbo and Katzenberg that might be disclosed to McNamara as counsel in the malpractice action would not be relevant to this case and, in any event, are no longer privileged.

The "mere appearance of impropriety...is not a sufficient basis for granting a

---

[3]The same reasoning might well apply to the communications between Zerbo and Katzenberg regarding the stock transaction. In a decision granting Lazzari's motion for summary judgment dismissing G.K. Alan's complaint, the Nassau County Supreme Court stated as follows:

> The plaintiff opposes the defendant's motion, inter alia, on the grounds that "it is G.K. Alan's position in this case that the entire consideration which Lazzari agreed to pay under the Consulting Agreement is payment for the stock which Katzenberg sold Lazzari in March 2001." The Court has previously rejected this argument. In this regard, the Court reaffirms its prior holding that "the Consulting Agreement as written can only be interpreted as a contract by the defendant to hirer the plaintiff to provide consulting services to the Acme Companies." The Court cannot ignore the plain language of the Consulting Agreement and interpret it [as Katzenberg apparently argued] as a "tax device" *designed to avoid or evade tax laws*. If it is a "tax device," the plaintiff's amended complaint would still be dismissed because *the Court will not enforce a sham agreement*.

MacKenzie Decl., Ex. A at 4 (emphasis added and internal citations omitted).

disqualification motion absent a threat that the trial will be tainted." *Dinger v. Gulino*, 661 F.Supp. 438, 445 (E.D.N.Y. 1987), *citing Armstrong v. McAlpin*, 625 F.2d 433, 446 (2d. Cir. 1980). *See also Hempstead Video, Inc.*, 409 F.3d at 132; *Nyquist*, 590 F.2d at 1247. For the reasons stated above, no such threat is presented here. Therefore, and in keeping with the "restrained approach" to disqualification motions in this Circuit, defendants' motion to disqualify plaintiffs' counsel is denied.

SO ORDERED

_____/s/_____
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
March 29, 2007

*U:\JB 2006-2007\Acme032907.wpd*