UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ACME AMERICAN REPAIRS, INC.; ACME
AMERICAN ENVIRONMENTAL CO., INC.;
ACME COMMERCIAL KITCHEN DESIGN,
INC.; ACME AMERICAN REFRIGERATION,
INC.; ACME PACIFIC REPAIRS. INC.,; BANA
PARTS, INC.; and BANA COMMERCIAL                    MEMORANDUM & ORDER
KITCHEN, INC.,                                       03-CV-4740 (RRM)(SMG)

                        Plaintiffs,

            - against -

HARVEY KATZENBERG and PEARL
KATZENBERG, f/k/a PEARL FEUER,

                        Defendants.
------------------------------------------------------------X
MAUSKOPF, United States District Judge.

    Plaintiffs Acme American Repairs Inc., Acme American Environmental, LLC,[1]

Commercial Kitchen Design, Inc.,[2] Acme American Refrigeration, Inc., Acme Pacific Repairs,

Inc., Bana Parts, Inc., and Bana Commercial Kitchen Parts, Inc.[3] (collectively "Plaintiffs" or the

"Acme Plaintiffs") commenced this action against Harvey Katzenberg and Pearl Katzenberg

(collectively "Defendants" or the "Katzenbergs"), alleging common law tort claims, as well as

violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1961-68, and New York General Business Law § 349. Before this Court are the

parties' respective cross-motions for summary judgment.

---

[1]     The case caption incorrectly names Acme Environmental, LLC as Acme American Environmental Co., Inc.
(Pl. 56.1 Stmt. ¶ 8.)

[2]     The case caption incorrectly names Commercial Kitchen Design, Inc. as Acme Commercial Kitchen
Design, Inc. (Pl. 56.1 Stmt. ¶ 10.)

[3]     The case caption incorrectly names Bana Commercial Kitchen Parts, Inc. as Bana Parts Commercial
Kitchen Parts. (Pl. 56.1 Stmt. ¶ 9.)

# FACTUAL BACKGROUND

The instant action is predicated upon an admitted scheme by former Acme employees to defraud certain non-party insurance carriers. The Acme Plaintiffs contend that they were unaware of the scheme, and wholly without complicity. As such, they seek to recover damages allegedly done the Acme companies through that scheme, which they claim was orchestrated exclusively by former Acme corporate officers (and now husband and wife), Harvey and Pearl Katzenberg.[4]

The Katzenbergs admit that they misrepresented Acme corporate assets, inventory, payroll and other relevant information in a deception engineered to yield lower liability insurance and workers' compensation premiums. The Katzenbergs then personally retained an estimated one-third of Acme's ill-gotten savings by submitting—through their independent corporate entity, G.K. Alan Associates, Inc. ("G.K. Alan"), an insurance brokerage—inflated insurance invoices for payment by the Acme Companies.[5] It is the Katzenbergs' position that the corporate plaintiffs and their respective executives were complicit in that scheme, and that they were aware of the transmittal of fraudulent information to insurers as well as the Katzenbergs' retention of a portion of the fraud profits through invoice overcharges directed at the Acme Plaintiffs.[6]

---

[4] In 1991, Harvey Katzenberg married Defendant Pearl Katzenberg, née Feuer. She then worked for Acme Repairs in contract administration from about 1995 until March 2001.

[5] Prior to her Acme employment, in or about 1984, Pearl Katzenberg formed G.K. Alan, an insurance brokerage business with its office in the Katzenbergs' residence in Woodbury, New York. Prior to and during her employment with Acme Repairs, Pearl Katzenberg, through G.K. Alan, served concurrently as insurance broker for Acme Repairs and subsequently all the Acme Plaintiffs, from 1985 through 2003. In that capacity, Pearl Katzenberg, through G.K. Alan, arranged various types of commercial insurance for the Plaintiffs, including workers' compensation, commercial general liability, motor vehicle insurance, and umbrella policies. It is undisputed that, at some point after his marriage to Pearl Katzenberg, Harvey Katzenberg became a 50% shareholder in his wife's company, G.K. Allen, and that they were its only employees.

[6] It is not disputed that subsequent to G.K. Allen's 2001 relocation to Arizona, invoices to the New York-based Acme companies were transmitted by either mail or facsimile. Defendants contend that prior to 2001, while they lived in New York, Pearl hand delivered invoices to the New York companies, Acme Repairs, Acme

2

The insurance fraud scheme at issue was previously the subject of significant state court action in the New York Supreme Court, Nassau County. In *G.K. Alan Assoc., Inc. v. Lazzari*, 867 N.Y.S.2d 374, 2008 WL 2779873 (Sup. Ct. 2008), G.K. Alan sued Acme Repairs' current owner, Derval Lazzari, for breach of a consulting agreement entered into by and between G.K. Alan and Lazzari.[7] By that agreement, Lazzari had contracted to receive ongoing consulting services regarding the management and marketing of the Acme Companies. The consulting agreement was to run for a 15-year period at a monthly rate of $25,000 (i.e., $300,000 annually) and was executed in connection with Lazzari's 2001 buyout of the Katzenbergs' ownership stake in four of the Acme Companies: Acme American Repair, Acme American Refrigeration, Acme Environmental, and non-party entity, Factory Parts & Services. *Id.* at *1.

In 2003, however, Lazzari unilaterally terminated that agreement, allegedly because it was only then that he discovered the Katzenbergs' invoice overcharges. After Lazzari refused to make additional payments under the consulting agreement, G.K. Alan sued for breach. *Id.* at *2. Lazzari counterclaimed against G.K. Alan and Harvey Katzenberg individually, seeking reimbursement of sums previously paid under the agreement. *Id.* at *5. After 13-day, non-jury trial, the New York Supreme Court (Brandveen, J.) concluded that neither Lazzari nor any other Acme Company executive had been aware G.K. Alan's invoice overcharges prior to 2003, and that they were also unaware that G.K. Alan had submitted fraudulent information to insurers on their behalf. *Id.* at *4. On that basis, the court denied G.K. Alan's claim for breach, and

---

Refrigeration, Acme Environmental and Commercial Kitchen, which all had their principal places of business in Brooklyn, New York.

[7] According to the Nassau County Supreme Court decision, of which this Court takes judicial notice, the agreement was structured such that G.K. Alan was entered as consultant, rather than the Katzenbergs personally. Apparently, this arrangement was engineered as a result of the legal or practical implications of Harvey Katzenberg's disability insurance policy, which G.K. Alan brokered and from which he received disability payments. *See G.K. Alan*, 867 N.Y.S.2d 374, __ , 2008 WL 2779873, *1. In any event, the structure of the transaction and its motivations is not germane to the current dispute.

awarded $350,000 on Lazzari's restitution claim, awarding reimbursement of sums already paid to G.K. Alan under the consulting agreement. *Id.* at *6.

Upon a *de novo* review of the record, the Appellate Division, Second Department, agreed that Lazzari and the other Acme executives were unaware of G.K. Alan's overcharges, and that such misconduct amounted to theft warranting termination of the consulting agreement under the tenets of New York's "faithless agent" doctrine. *G.K. Alan Assoc. Inc. v. Lazzari*, 66 A.D.3d 830, 833 (App. Div. 2009). Nonetheless, the Appellate Division vacated Lazzari's restitution counterclaim, finding that he had failed to establish that the insurance overcharges tainted or otherwise interfered with the consulting services G.K. Alan had previously rendered. *Id.* at 834 ("The trial record contains conflicting evidence as to whether Lazzari and the other corporate managers were aware of and participated in Alan's practice of making material misrepresentations to the Corporations' insurers."). Accordingly, the appellate Court upheld Lazzari's right to terminate the agreement on the basis of disloyalty, but vacated the trial court's restitution award for past compensation. *See id.*

Moreover, the Court tethered termination of the consultation agreement to Lazzari's overcharge counterclaim, and rejected the trial court's additional finding that the Katzenbergs' fraudulent reports to Acme's insurers also justified contract termination. In this regard, the Appellate Division did not agree that the Acme Companies' lack of complicity in submitting false information to insurance carriers had adequately been established. The Appellate Division thus vacated that factual determination, *see id.*, and it remains an open issue in the instant lawsuit.

## SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no issues of material fact in dispute and that one party is entitled judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect

to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-48).

On cross-motions for summary judgment, either side may assert that there is a genuine issue of material fact that prevents judgment against it as a matter of law. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). Moreover, when both sides move for summary judgment, "a district court is not required to grant judgment as a matter of law for one side or the other." *Id.* "Rather, the court must evaluate each party's motion on its own merits, taking in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

## DISCUSSION

### I.

### Federal Civil RICO Claims

Both parties seek summary judgment on civil RICO and RICO conspiracy claims brought pursuant to 18 U.S.C. §§ 1961-68. For the reasons stated below, this Court finds that Plaintiffs have failed to allege a substantive RICO violation.

To establish a RICO claim, a plaintiff must prove that the defendant's violation of the RICO statute caused injury to the plaintiff's business or property. *See DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001). The relevant substantive section to the instant action is 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (2006). To

establish a RICO violation under § 1962(c) a plaintiff must show: (1) the defendant's conduct or participation; (2) in an enterprise; (3) through a pattern of racketeering activity. *DeFalco*, 244 F.3d at 306 (quoting *Sedima, S.P.R L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).[8] Each element of § 1962(c) must be established as to each individual defendant. *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004) (citing *DeFalco*, 344 F.3d at 306).

## A. Acme Plaintiffs Have Adequately Alleged Defendants' Conduct or Participation

To establish RICO liability. it must be shown that the defendant participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). This "operation or management" test does not limit liability to those with primary responsibility for the enterprise's affairs, or even to those with a formal position in the enterprise. *See, e.g.*, *DeFalco*, 244 F.3d at 311. Instead, liability potentially extends to those who influence or direct an enterprise without holding an official management or employment position, as long as such persons demonstrably undertake "*some* part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179.

In this case, Plaintiffs have established that both Harvey and Pearl Katzenberg—G.K. Alan's only employees—sufficiently conducted or participated in the conduct of G.K Alan's business. It is undisputed that Pearl Katzenberg was the primary director and manager of G.K. Alan's insurance business, and that she formed the company as its only licensed insurance broker. In that role, she admits that she provided insurance coverage to the Acme Plaintiffs from 1985 to 2003, and that from at least 1995 to 2003 issued G.K. Alan invoices charging inflated

---

[8] An enterprise must also be engaged in, or its activities must affect, interstate or foreign commerce. The Second Circuit requires only "a minimal effect on interstate commerce" to prove a RICO claim. *Mikhlin v. HSBC*, No. 08-CV-1302, 2009 WL 485667, at *2 n. 9 (E.D.N.Y. February 26, 2009) (quoting *DeFalco*, 244 F.3d at 309).

insurance premiums. By these means, Pearl Katzenberg affirmatively conducted and substantially participated in the conduct of G.K. Alan's affairs for RICO purposes.

Conduct and participation is likewise established with respect to Harvey Katzenberg. Although Defendants argue that his role at G.K. Alan was limited to ministerial book-keeping, *see United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994) (ministerial duties insufficient to establish participation within scope of § 1962(c)), that averment is clearly belied by the record. Indeed, this Court need only take judicial notice of the underlying consulting agreement by and between G.K. Alan and Lazzari to confirm that Harvey Katzenberg, acting in G.K. Alan's name, performed substantial services thereunder. Pursuant to that binding contract, G.K. Alan was obligated to and did provide the following stated services:

> ...consultation regarding sale to and service to customers, to develop marketing strategies. to explore new market places, to assist with tax and insurance audits, to assist with regulatory inquiries, to assist with claims of customers or suppliers and to be available generally to assist [Lazzari] in operat[ing] the business interest of each of the [Acme] companies.

*G.K. Alan*, 867 N.Y.S. 2d at __, 2008 WL 2779873, at *6.

It is evident therefore that Harvey Katzenberg's expertise and management experience was the driving force behind the considerable consultation services provided by G.K. Alan to the Acme Companies during the effective period of the consulting agreement. More importantly, G.K. Alan's consulting role appears to have been closely related to its insurance fraud scheme. In this regard, Judge Brandveen expressly found that "...without the Consulting Agreement Harvey and Pearl Katzenberg could not have continued their control of the financial aspects of the Acme companies which allowed them to continue their embezzlement from the companies." *Id.*, 867 N.Y.S. 2d at __, 2008 WL 2779873, at *3. Thus, Harvey Katzenberg's conduct on G.K.

Alan's behalf and in connection with the furtherance of its insurance fraud scheme has been sufficiently established for RICO liability.

## B. Acme Plaintiffs Have Adequately Alleged an Enterprise

In construing the "enterprise" provision of 18 U.S.C. § 1961(4), the Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see also First Capital Asset Mgmt., Inc. v. Satinwood Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). It may consist of legal entities, such as corporations, associations, or partnerships, as well as informal associations, unions, or groups of individuals. *See Turkette*, 452 U.S. at 582.

To satisfy the RICO requirements, the alleged enterprise must be demonstrably separate from the complained of pattern of racketeering activity. *Id.* In other words, both an enterprise (an association for a common purpose), and a pattern of racketeering activity (a series of criminal acts defined by the RICO statute), must be proven independently to establish a § 1962(c) claim. *Id.* However, the "enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or structural hierarchy, so long as it is in fact an enterprise as defined in the statute." *Pavlov v. Bank of New York Co., Inc.*, 25 Fed. App'x 70, 71-72 (2d Cir. 2002).

Last, a plaintiff must prove the existence of the enterprise as being separate and distinct from the defendant "person;"[9] the enterprise cannot be an individual defendant simply referred to by a different name, although satisfaction of this element "requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation)." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 165 (2001). Consequently, a single employee

---

[9] The term person "includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3) (2006).

corporation owned by the defendant person may constitute an enterprise. *See id.* at 158 (holding that RICO applies "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope or beyond the scope, of corporate authority.").

Plaintiffs validly contend that G.K. Alan constitutes the RICO enterprise in this case. G.K. Alan is a corporation organized, at least ostensibly, for the purpose of brokering insurance coverage, later tasked with providing consulting services for the Acme Companies. It is therefore evident that G.K. Alan is a legal entity organized for the purpose of engaging in a course of facially legitimate business conduct.[10] *See Satinwood*, 385 F.3d at 173.

To counter this "enterprise" showing, the Katzenbergs argue that Plaintiffs have not established G.K. Alan as an organization separate and distinct from its principals. In support, Defendants contend that Plaintiffs' allegations against G.K. Alan are identical to and inseparable from the claims brought against the Katzenbergs individually. This argument is unavailing. Although G.K. Alan is closely held—the Katzenbergs being its shareholders—it is, nonetheless, a separate corporate entity with an independent legal identity from that of its individual principals. The independence of that legal identity suffices to render that RICO-qualifying enterprise separate and distinct from the individuals sued in the instant actions. *Cf. Cedric Kushner Promotions, Ltd.*, 533 U.S. at 158 (holding a corporation to be a sufficient RICO enterprise even when the individual defendant was the sole employee of that company).

## C. Acme Plaintiffs Fail to Allege a Pattern of Racketeering Activity

18 U.S.C. § 1961(1) defines the scope of racketeering activity. The statute includes any act indictable under 18 U.S.C. § 1341, which relates to mail fraud. *See* 18 U.S.C. § 1961(1)

---

[10]  Even if, *arguendo*, G.K. Alan were organized solely for illegitimate purposes, under Second Circuit precedent it would nonetheless qualify as a RICO enterprise. *See Pavlov*, 25 Fed. App'x at 71-72 (holding enterprise need not have continuity beyond pattern of racketeering activity).

(2006). Defendants admit some incidents of overbilling Plaintiffs, and that the scheme used mail and wire services, at least in some instances.

RICO liability under § 1962(c), however, requires a "pattern of racketeering activity." § 1962(c). Pursuant to title 18 U.S.C. § 1961(5), a RICO pattern "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years…after the commission of a prior act of racketeering activity[.]" However, the Supreme Court has explained that the section "does not so much define a pattern of racketeering as state a minimum necessary condition for existence of such a pattern." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). "[It] concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *Id.* at 238 (emphasis in original).

Further, a pattern of racketeering activity requires relatedness and continuity: "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239 (emphasis added). The requirement that a racketeering pattern be "related" refers to whether the predicate acts have the same or similar purposes, results, participants, victims, or methods of commission. *Id.* at 240. Thus, isolated or sporadic acts of racketeering activity do not create a pattern. *Id.*

The continuity element must be established either by proving either an open-ended pattern or closed-ended pattern of racketeering activity. *Id.* at 238. The former may be shown by "past criminal conduct coupled with a threat of future criminal conduct." *Satinwood*, 385 F.3d at 180 (quoting *GICC Capital Corp. v. Tech. Fin. Group Inc.*, 67 F.3d 463, 466 (2d Cir. 1995). "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir.

2008). When the alleged enterprise is, as here, an ostensibly legitimate business, however, there is no such presumption, and there must exist evidence that either gives rise to an inference that the predicate acts were the regular way of operating the business or that their very nature implies a threat. *Id.*

By contrast, to satisfy closed-ended continuity, a plaintiff must prove "past criminal conduct extending over a substantial period of time" *Id.* "[S]ince the Supreme Court decided *H.J. Inc.*, [the Second Circuit] has never held a period of less than two years to constitute a 'substantial period of time.'" *Cofacredit*, 187 F.3d at 242. Continuity is primarily a temporal concept, but the quantity and duration of the alleged racketeering activity is not necessarily determinative. *H.J. Inc.*, 492 U.S. at 238, 241-42. The Second Circuit has recognized that in addition to the duration of an alleged pattern, other considerations relevant to the existence of a closed-ended continuity include the number and variety of predicate acts, the number of participants and victims, and the existence of separate schemes. *Spool*, 520 F.3d at 184; *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *Gross v. Waywell*, 628 F. Supp. 2d 475, 486 (S.D.N.Y. 2009). Accordingly, courts in this Circuit have held that RICO allegations involving minimal variety in predicate acts, a limited number of participants or victims, and a discrete scheme with a narrow purpose are generally insufficient to establish a closed-ended continuity pattern. *See, e.g., Satinwood*, 385 F.3d at 182 (holding that a pattern was not established where a single defendant engaged in a discrete scheme to defraud two creditors, despite predicate acts spanning two and a half years); *Ritter. v. Klisivitch*, No. 06-CV-5511, 2008 WL 2967627, at *11 (E.D.N.Y. July 30, 2008) (finding that a single narrow scheme with one victim and limited participants did "not constitute the sort of 'long-term criminal conduct' that Congress sought to target in RICO"); *Lefkowitz v. Bank of New York*, No.

01 Civ. 6252, 2002 WL 224800, at *8 (S.D.N.Y. Oct. 31, 2003) ("Courts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity."), *rev'd on other grounds*, 528 F.3d 102 (2d Cir. 2007).

Finally, courts have repeatedly held that RICO claims based solely on mail and wire fraud may not necessarily constitute a pattern of racketeering activity. *See, e.g., Spool*, 520 F.3d at 184; *Gross*, 628 F. Supp. 2d at 494 (finding that a scheme involving over 100 instances of mail and/or wire fraud over four years in furtherance of the looting of plaintiff's corporation did not constitute a pattern); *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 256-57 (S.D.N.Y. 2002) (holding that a scheme of four predicate acts of mail fraud over seven years by one participant as part of a single fraudulent scheme against limited victims was not a pattern of racketeering activity). The danger is that RICO allegations based solely on mail or wire fraud can easily be transformed from what may be a typical common law fraud action into a federal statutory claim because "[v]irtually every ordinary fraud is carried out in some form by means of mail or wire communication." *Gross*, 628 F. Supp. 2d at 493 (citing *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). Therefore, such RICO claims must be heavily scrutinized, and even a multiplicity of mailings may not satisfy the requisite continuity to establish a pattern of racketeering activity. *Id.* at 493-94 (citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000).

In this case, the Acme Plaintiffs' allegations against Harvey and Pearl Katzenberg fail to establish a pattern of racketeering activity. Assuming that Plaintiffs have established predicate acts of mail or wire fraud directed at each of the Acme Companies occurring over the course of

at least several years, they have still not alleged a sufficient RICO pattern under either an open-ended or closed-ended theory.[11]

First, Plaintiffs do not demonstrate open-ended continuity because there is no continued threat of racketeering activity. *See Satinwood*, 385 F.3d at 180. The business relationship between Plaintiffs and Defendants was discontinued in 2003, and there is no potential for furtherance of the invoicing scheme.

Second, Plaintiffs cannot satisfy the elements necessary to establish RICO liability under a closed-ended continuity theory. Notably, Plaintiffs allege (1) no variety of predicate acts, (2) only a limited number of participants and victims, and (3) describe only a discrete overcharge scheme with a narrow purpose. *See Satinwood*, 385 F.3d at 182. In sum, Plaintiffs claim that the Katzenbergs were the only individual participants in the fraudulent insurance scheme, which was directed solely at a single, closely-related family of victim companies. Apart from this discreet insurance scheme, however, there is no evidence that the Katzenbergs or G.K. Alan took part in any further racketeering activity.

The limited nature of the subject scheme may be contrasted with the more expansive RICO insurance scheme described in *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432 (S.D.N.Y. 2004). In that case, a host of related livery cab companies conspired to misrepresent corporate assets and liabilities to their insurer. *Id.* at 443. However, the *United Limousine* scheme was considerably more expansive than that in the case at bar; in addition to defrauding their insurance carrier, defendants undertook to counterfeit and resell

---

[11] This Court notes that the fraud complained of falls arguably within the ambit of the RICO statute, only because the activity involved certain instances of mail and wire fraud. Such claims are generally viewed with skepticism else every fraudulent use of the mails, however limited would establish RICO liability. *Accord Spool*, 520 F.3d at 184; *Gross*, 628 F. Supp. 2d at 494 (finding limited fraud scheme involving over 100 instances of mail and/or wire fraud over four years in furtherance of plaintiff's corporation did not constitute pattern); *Neschis*, 229 F. Supp. 2d at 256-57 (holding scheme of four predicate acts of mail fraud over seven years by one participant as part of single fraudulent scheme against limited victims was not pattern of racketeering activity).

bogus insurance policies to a large number of innocent limousine owners and drivers, encompassing a wide-range of individual, unrelated victims. *Id.* Further, United Limousine reinvested the revenue generated by its fraudulent, grossly excessive premiums to expand the scope and efficacy of the scheme. *Id.* On those facts, the district court denied defendants' motion to dismiss, determining that the vast scope of United Limousine's fraud sufficiently established a *prima facie* RICO pattern.

Both the case at bar and *United Limousine* feature the misrepresentation of insurance data and the fraudulent overcharge of insurance premiums. However, the effects of United Limousine's scheme, perpetrated against many innocent victims, were considerably further-reaching than the Katzenbergs' fraud, perpetrated solely against the Acme corporate family. The Katzenbergs' fraud is thus more properly characterized as the straightforward embezzlement of corporate funds by former corporate officers. Although deplorable, this conventional corporate swindle is not intended to fall within the ambit of the federal RICO statute. *Ritter. v. Klisivitch*, No. 06-CV-5511, 2008 WL 2967627, at *11 (E.D.N.Y. July 30, 2008) (finding that a single narrow scheme with one victim and limited participants did "not constitute the sort of 'long-term criminal conduct' that Congress sought to target in RICO"). Accordingly, because Plaintiffs have failed to allege a pattern of racketeering activity as contemplated by the statute, their RICO claims are dismissed in their entirety.

Similarly, for the reasons above, the Court also dismisses as to both Defendants Plaintiff's Eighth cause of action for RICO conspiracy, 18 U.S.C. § 1964(d). The failure to establish a substantive violation of RICO mandates the dismissal of a cause of action alleging RICO conspiracy. *See Satinwood*, 385 F.3d at 182; *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on conspiracy to violate the other

subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.")

## II.

### New York State Law Claims

In addition to federal RICO claims, Plaintiffs also assert a host of claims based in New York state law, including violations of section 349 of New York's General Business Law, and common law claims for fraud, breach of contract, breach of the duty of good faith and fair dealing, and violations of the faithless servant doctrine.[12] For the reasons stated below, Plaintiff fails to state a viable cause of action, while the remainder of claims create triable questions of fact or are subject to equitable defenses sufficient to preclude favorable judgment as a matter of law.

### A. Claims Subject to Summary Dismissal

### (i) Breach of Contract

Plaintiffs allege a cause of action for breach of contract only against Defendant Pearl Katzenberg. To state a claim for breach of contract under New York law, a complaint need only allege: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

In this case, Plaintiffs have not satisfied their burden to establish—as they must—the essential elements of a contract claim. In their opposition to summary judgment, Plaintiffs assert

---

[12] Plaintiff's Tenth cause of action asserts a claim for conversion against the Katzenbergs. Plaintiffs move for summary judgment on this claim, which Defendants fail to address. However, disputes of fact prevent granting Plaintiff's motion. *See supra* at pp. 2-4.

no facts to support the validity of their claim, merely providing general legal principles on the standard for summary judgment. They offer no evidence of any contractual relationship with Pearl Katzenberg. Moreover, although Plaintiffs allege that G.K. Alan was "retained" to provide contract insurance from 1995 through 2003, they cite no specific instrument that might form the basis of a contractual arrangement. To the contrary, Defendants state unequivocally that, while G.K. Alan did routinely perform brokerage services for the Acme Companies, that relationship was not forged out of any specified negotiation and was not undertaken pursuant to any formal agreement entered into by and between Pearl Katzenberg or any other party. Accordingly, Defendants motion for summary judgment on Plaintiffs' contract claim is granted.

### (ii) Breach of the Duty of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods, Inc. v. Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992). It is a well-settled principle that claims for breach of the implied covenant of good faith and fair dealing are not distinct from the underlying breach of contract claim and therefore must be dismissed. *Computech Int'l Inc. v. Compaq Computer Corp.*, 2002 WL 31398933, *4 (S.D.N.Y. Oct. 24, 2002).

As stated above, the Katzenbergs' brokerage services to the Acme Companies is not supported by any enforceable contract. This mandates the dismissal of any claim predicated, as here, on a contract's implicit covenant of good faith and fair dealing. *See id.* Therefore, this claim must be dismissed.

### (iii) N.Y. Gen. Bus. L. § 349

Section 349 of the New York General Business Law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a). To make out a *prima facie* case under section 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank* , 85 N.Y.2d 20, 25 (1995).

The assertion of a New York deceptive trade practices claim fails in the instant case. Section 349 claims are generally inapplicable where, as here, the underlying fraud or deception arises out of a private commercial relationship between sophisticated corporate entities and does not affect the public interest. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). In this case, there is simply no "consumer-oriented" conduct sufficient to give rise to an actionable section 349 claim. *Id.* At best, Plaintiffs complain of a sophisticated fraud scheme by G.K. Alan, focused exclusively at the Acme Companies. There is, however, no suggestion that G.K. Alan is involved in providing insurance to insurance consumers in general. As such, there can be no colorable claim that the Katzenbergs engaged in deceptive, consumer-oriented conduct within the meaning of section 349. That claim should therefore be dismissed.

## B. Claims on Which Summary Judgment Should Be Denied

### (i) Breach of Fiduciary Duty

The elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty between plaintiff and defendant, (2) the breach of that duty by defendant, and (3) damages as a result of the breach. *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986); *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F.Supp.2d 265, 270 (S.D.N.Y. 2006), *remanded on other grounds by* 253 Fed. App'x 52 (2d Cir. 2007).

Defendants concede that Plaintiffs' fiduciary duty claim has been adequately pled and raises at least a jury question. This Court agrees. The Katzenbergs used their influence as officers to misrepresent the assets of the Acme Companies, in furtherance of their insurance fraud scheme. That insider influence was then abused to perpetuate the invoice overcharge aspect of the fraudulent scheme even after the Katzenbergs sold much of their ownership stake in the Acme Companies and relocated to Arizona. *G.K. Alan*, 867 N.Y.S.2d 374, __ , 2008 WL 2779873, at *8. This access to and supervision of the Acme Companies—exercised by way of the consulting agreement—suffices to establish at least a colorable fiduciary relationship between the Katzenbergs and the Acme Companies.

However, notwithstanding the potential viability of this claim, as discussed more fully below, the possible participation in the fraudulent activity by Acme's current ownership, implicates the doctrine of *in pari delicto*, gives rise to triable questions of fact, and precludes the grant of summary judgment.

**(ii) Fraud**

Under New York law, the elements of a claim for fraud are: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 19 (2d Cir. 1996); *see also Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001); *accord. Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996).

As to the first requirement, a misrepresentation "must be factual, rather than an expression of an opinion." *Green v. Beer*, No. 06 Civ. 4156, 2009 WL 911015, at *5 (S.D.N.Y. Mar. 31, 2009) (citation omitted). "[I]nstead of an affirmative misrepresentation, a fraud cause of action may also be premised on acts of concealment where the defendant had a duty to

19

disclose material information." *Kaufman*, 760 N.Y.S.2d at 165 (citations omitted). "Thus, where a fiduciary relationship exists, 'the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive.' " *Id.* (quoted reference omitted); *see Bickhardt v. Ratner*, 871 F.Supp. 613, 618-20 (S.D.N.Y. 1994) (Leisure, J.) ("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations." (internal quotation marks and citation omitted)); *see also Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d 132, 134 (App. Div. 2005) (stating that a duty to disclose may arise either from a fiduciary relationship or from "one party's superior knowledge of essential facts" whose nondisclosure would "render a transaction inherently unfair" (internal quotation marks and citations omitted)).

It is undisputed that G.K. Alan and the Katzenbergs perpetrated a fraud upon Acme's insurance carriers. Nor is there any dispute that, as a component of that fraud, G.K. Alan substantially overbilled the Acme Companies for insurance coverage. They did so as corporate insiders, and also, subsequently, as third-party agents of the Acme family of companies. In so doing, the Katzenbergs breached their duty of loyalty to the Acme Companies, which underlies Plaintiffs' claims for breach of fiduciary duty, breach of the duty of good faith and fair dealing, and the faithless servant doctrine. Indeed, the Nassau County Supreme Court deemed Defendants faithless servants and held as justified the Acme Companies decision to break its contractual relationship with the Katzenbergs. *See G.K. Alan*, 867 N.Y.S. 2d at __, 2008 WL 2779873, at *5.

This claim, while potentially viable, is subject to the doctrine of *in pari delicto*, which raises triable questions of fact sufficient to preclude summary judgment.

### (iii) *In Pari Delicto*

The common law defense of *in pari delicto*, literally meaning "in equal fault," precludes a plaintiff from recovering as a result of his own wrongful conduct. *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). "In a case of equal or mutual fault...the position of the defending party...is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)). The defense is premised on two principles: (1) that courts should not provide a forum to resolve disputes between wrongdoers; and (2) barring relief to an admitted wrongdoer will deter illegal conduct. *See Bateman*, 472 U.S. at 306.

"[A] plaintiff who is 'an active, voluntary participant in the unlawful activity that is the subject of the suit'" is prohibited from prosecuting the action. *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 308 (S.D.N.Y. 1998) (quoting *Pinter*, 408 U.S. at 635-36). This rule applies with equal force to individual and corporate wrongdoers. *See, e.g., Pinter*, 408 U.S. at 632; *Ross v. Bolton*, 904 F.2d 819, 824-33 (2d Cir. 1990). The law imputes to the corporation the knowledge and conduct of the guilty insider: a corporation only acts through its agents, and the imputation of the agent's wrongful conduct lies at the heart of *in pari delicto*. *Gordon v. Basroon (In re Plaza Mortg. & Fin. Corp.)*, 187 B.R. 37, 45 (Bankr. N.D. Ga. 1995); *see also In re Granite Partners, L.P.*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996); *Mirror Group Newspapers, plc. v. Maxwell Newspapers, Inc. ( In re Maxwell Newspapers, Inc.)*, 164 B.R. 858, 865-66, 870 (Bankr. S.D.N.Y. 1994); *cf. Cenco, Inc. v. Seidman & Seidman*, 686 F.2d at 454 ("[A] participant in a fraud cannot also be a victim entitled to recover damages.").

Defendants allege that Acme Company executives were not only aware of G.K. Alan's invoice overcharge practices, but approved that practice as a means to reward the Katzenbergs for their ingenuity in defrauding insurance carriers on the Acme Companies' behalf. Essentially,

the Katzenbergs characterize the instant action as an attempt by the Acme Companies to recover a greater share of the conspiracy's fraud proceeds. Such conduct would vitiate Plaintiffs' claims for fraud and breach of fiduciary duty, and thus precludes this Court from granting summary judgment to either party.[13]

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 121] is GRANTED IN PART and DENIED IN PART. Plaintiffs' Motion for Summary Judgment [Doc. No.122] is DENIED. This matter is recommitted to the assigned Magistrate Judge to resolve all remaining pre-trial issues, to supervise the preparation of a Joint Pre-Trial Order, and for any settlement discussions.

SO ORDERED.

Dated: Brooklyn, New York
September 24, 2010

_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

[13] This issue is underscored by the recent decision of the New York Supreme Court, Appellate Division, which rejected an earlier trial court exonerating the Acme Companies. *See G.K. Alan*, 887 N.Y.S.2d 233 (App. Div. 2009). The Appellate Division made clear that the underlying evidentiary record did not establish the Acme Plaintiff's innocence and that the trial court's finding to the contrary was not warranted. In sum, the Appellate Division agreed that the Katzenbergs' fraud triggered the faithless servant doctrine and permitted the Acme Companies to sever the relationship created by the consulting agreement going forward. The Court did not agree, however, that retroactive damages had been established. The parties do not address the impact, if any, of the state court's ruling on the instant matter.